UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
PATRICK HANNON AND                                    Chapter 7
ELIZABETH HANNON,                                     Case No. 12-13862-WCH
                DEBTORS.
_____

ABCD HOLDINGS, LLC,
ABC&D RECYCLING, INC., AND
WARE REAL ESTATE, LLC,
                PLAINTIFFS,
                                                      Adversary Proceeding
v.                                                    No. 13-1306

PATRICK HANNON,
                DEFENDANT.
_____


## MEMORANDUM OF DECISION

### I. INTRODUCTION

The matter before the Court is the "Plaintiffs' Motion for Partial Summary Judgment" (the "Motion for Summary Judgment") filed by the plaintiffs, ABCD Holdings, LLC, ABC&D Recycling, Inc., and Ware Real Estate, LLC (collectively, the "Plaintiffs"), and the opposition thereto filed by the debtor, Patrick Hannon (the "Debtor").  The Plaintiffs seek to deny the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(4)(A) for making a false oath or account in connection with his bankruptcy case, asserting that the record undisputedly shows that the Debtor made false statements on his monthly operating reports.  For the reasons set forth below, I will grant the Motion for Summary Judgment.

## II. PROCEDURAL MATTERS

Pursuant to Local Rule 56.1 of the United States District Court for the District of Massachusetts, a motion for summary judgment must include "a concise statement of material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions, and other documentation."[1]  Similarly, an opposition to summary judgment must be accompanied by a statement of material facts to which the opposing party contends that there exists a genuine issue to be tried, with supporting references to the record.[2]  All referenced documents must be filed as exhibits to the motion or opposition.[3] Material facts set forth in the moving party's statement are deemed admitted for purposes of summary judgment if not controverted by an opposing statement.[4]

As the local rule requires, the Plaintiffs' Motion for Summary Judgment included a statement of material facts (the "Plaintiffs' Statement of Facts") with citations to supporting exhibits.[5]  The Debtor filed an opposing statement which purported to dispute essentially all of the material facts at issue.[6]  I conducted a hearing on the Motion for Summary Judgment on January 8, 2014, at the conclusion of which I directed the parties to file further pleadings.  In his post-hearing briefs and supporting exhibits, the Debtor conceded many of the Plaintiffs'

---

[1] LR, D. Mass. 56.1, adopted and made applicable to proceedings in the Bankruptcy Court by Massachusetts Local Bankruptcy Rule 7056-1.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Docket No. 23.

[6] Docket No. 34.

allegations, while continuing to dispute others.[7]  Moreover, the Plaintiffs' post-hearing pleadings

adduced additional facts to record, to rebut the Debtor's post-hearing arguments.[8]  Accordingly,

the following recitation of facts draws from all of the parties' pleadings and the exhibits thereto.

Facts still in dispute are noted where relevant.

## III. <u>BACKGROUND</u>

On May 3, 2012, the Debtor and his spouse, Elizabeth Hannon (the "Joint Debtor") filed

a voluntary petition under Chapter 11 of the Bankruptcy Code.[9]  At that time, the Debtor was the

owner and sole officer and director of two companies—Ware Real Estate, LLC ("Ware Real

Estate") and ABC&D Recycling, Inc. ("ABC&D Recycling").[10]  Ware Real Estate owns real

property located in Ware, Massachusetts, at which ABC&D Recycling operates a construction

and demolition debris transfer station.[11]  The Debtor's ownership interests were subject to

warrant rights held by ABCD Holdings, LLC ("ABCD Holdings"), a company wholly owned by

the Debtor's former attorney, George McLaughlin.[12]  The warrant agreement gave ABCD

Holdings the option of purchasing a 50.1% interest in each company.[13]

On June 6, 2012, the Debtor appeared at the meeting of creditors held pursuant to

11 U.S.C. § 341 (the "341 Meeting").  At the 341 Meeting, Attorney Jennifer Hertz, counsel for

the United States Trustee (the "U.S. Trustee"), questioned the Debtor concerning his vacation

---

[7] *See* Docket Nos. 48, 49, and 50.

[8] *See* Docket No. 51.

[9] Plaintiffs' Statement of Facts, Docket No. 23 at ¶ 1.

[10] *Id.* at ¶ 2.

[11] *Id.*

[12] *Id.* at ¶ 3.

[13] *Id.* at ¶¶ 2-3.

homes in Wells, Maine (the "Wells House") and Truro, Massachusetts (the "Truro House").  The

Debtor testified as follows concerning the Wells House:

> HERTZ: … And who's living in this house?
>
> P. HANNON: Uh, nobody.
>
> HERTZ: Is this rentable?
>
> P. HANNON: Um… Possibly. It would need some work to do it.
>
> HERTZ: What kind of work?
>
> P. HANNON: Uh, there's some major leaks in the, in the house, and we've been in, unable to, um, fix it. The, um heating system won't stay running, and that's about it.
>
> HERTZ: Does anyone ever stay there?
>
> P. HANNON: Uh, we use the house occasionally during the day.
>
> HERTZ: What do you mean, occasionally during the day?
>
> P. HANNON: Um, we were going to use it last Sunday for a graduation party for my son from high school, but it rained so we didn't go there. Um, we don't go there very often. I probably haven't, um stayed in this house ten times since it was, since it was acquired.
>
> HERTZ: And when was it purchased?
>
> P. HANNON: Ninety-seven.[14]

As to the Truro House, the Debtor testified as follows:

> HERTZ: Is the house in North Truro currently occupied?
>
> P. HANNON: No.
>
> HERTZ: Um, is it – was it a vacation home or was it a income property?
>
> P. HANNON: Vacation home.
>
> HERTZ: OK, but no one currently uses it?

---

[14] Docket No. 51, Ex. A at 4.

P. HANNON: I use it once in a while.

HERTZ: Otherwise it's empty?

P. HANNON: Yes.[15]

Attorney Hertz also questioned the Debtor concerning his vehicles at the 341 Meeting. He stated that he personally owned one car and one motorcycle.[16]  He testified that the car the Joint Debtor used was titled in either ABC&D Recycling or Ware Real Estate's name.[17]  He stated that neither of those entities owned any other vehicles, except "an old beat up truck that's not registered."[18]

On June 27, 2012, McLaughlin obtained an ex-parte temporary restraining order in Suffolk Superior Court barring the Debtor from ABC&D Recycling's premises.[19]  On July 2, 2012, the Debtor obtained a modification of the order, allowing him to return to ABC&D Recycling and resume operations.[20]  According to the Debtor, when he returned to the premises, he discovered that all of the company's records and files had been removed.[21]

On July 17, 2012, ABCD Holdings exercised its warrant rights, becoming the majority shareholder of ABC&D Recycling and Ware Real Estate.[22]  On July 18, 2012, ABCD Holdings

---

[15] *Id.* at 5-6.

[16] *Id.* at 7.

[17] *Id.* at 7-8.

[18] *Id.* at 9-10.

[19] Affidavit of Patrick J. Hannon (the "Debtor's Affidavit"), Docket No. 48, Ex. 1 at ¶ 19.

[20] *Id.* at ¶ 20.

[21] *Id.* at ¶ 21.

[22] Plaintiff's Statement of Facts, Docket No. 23 at ¶ 3.

removed the Debtor as the manager of Ware Real Estate and appointed McLaughlin in his place.[23]  The Debtor continued, however, to operate ABC&D Recycling.[24]

As Chapter 11 debtors-in-possession, the Debtor and the Joint Debtor filed monthly operating reports ("MORs") with the U.S. Trustee's office for the months of May, June, July, August, and September 2012.[25]  The Debtor's counsel prepared the MORs from the bank statements for the Debtor's and the Joint Debtor's debtor-in-possession accounts (the "DIP accounts").[26]  The Debtor would then review the reports, which he signed under the penalty of perjury.[27]

On the May MOR questionnaire, the Debtor checked the box indicating "Yes" to the question, "Have funds been disbursed from any account other than a debtor-in-possession account this reporting period?"[28]  A footnote to the entry stated, "Payments from ABC&D [Recycling] for rent and utilities as detailed on MOR-2."[29]  On the May MOR "Schedule of Cash Receipts and Disbursements," the Debtor listed $1,407.24 in "Estate Disbursements Made by

---

[23] *Id.*

[24] *Id.*

[25] *Id.* at ¶ 4.

[26] Debtor's Affidavit, Docket No. 48, Ex. 1 at ¶¶ 5-7.  The Debtor was initially represented in his bankruptcy case by Attorney Christopher J. Condon of Murphy & King, Professional Corporation.  Attorney Condon assisted the Debtor in the preparation of the MORs.  On July 31, 2013, Attorney Condon filed an assented to motion to withdraw as the Debtor's attorney, which I granted.  The Debtor proceeded *pro se* until March 4, 2014, when Attorney Herbert Weinberg of Rosenberg & Weinberg filed a notice of appearance on behalf the Debtor.

[27] Debtor's Affidavit, Docket No. 48, Ex. 1 at ¶ 7; Docket No. 22, Ex. 1 at 2, 10, 20, 34, and 49.

[28] Docket No. 22, Ex. 1 at 2.

[29] *Id.* at 3.

Outside Sources," with the same footnote.[30] The Debtor reported "0" in "Total Receipts" for the month of May.[31]

On the June MOR questionnaire, the Debtor also checked "Yes" for the question concerning disbursements from non-debtor-in-possession accounts, and again included a footnote explaining that the funds were "Payments from ABC&D [Recycling] for rent and utilities as detailed on mor-2."[32] The June MOR's "Schedule of Cash Receipts and Disbursements" listed $2,830.30 in "Estate Disbursements Made by Outside Sources," with the same footnote.[33] The Debtor reported "0" in "Total Receipts" during June.[34]

On each of the July, August, and September 2012 MORs, the Debtor indicated "0" in "Estate Disbursements Made by Outside Sources."[35] The MORs reported "Total Receipts" of $20,165.75 in July and $6,831.05 in August.[36] The receipts consisted primarily of "revenues" of $17,965.75 in July and $4,331.05 in August.[37] The "revenues" corresponded to the amounts deposited into the Debtor's DIP account during the same months.[38] The remainder of the

---

[30] *Id.* at 4.

[31] *Id.*

[32] *Id.* at 11.

[33] *Id.* at 12.

[34] *Id.*

[35] *Id.* at 22, 36, and 51.

[36] *Id.* at 22, 36, and 51.

[37] *Id.* at 23 and 37.

[38] *Id.* at 30 and 45.

receipts reported in July and August consisted of transfers from the Debtor's DIP account to the Joint Debtor's DIP account.[39]

When filing the August MOR, the Debtor filed an addendum to the May and June MORs (the "Addendum"), which explained in further detail the "Estate Disbursements Made by Outside Sources."[40]  The Addendum was labeled "Schedule of Payments by ABC&D [Recycling] on behalf of Debtors" and broke down the payments into the following categories:[41]

|  | May | June |
|---|---|---|
| Cable | $97.84 | $101.20 |
| Insurance Property | $774.75 | $109.45 |
| NSTAR Elec | $355.76 | $119.65 |
| Food | $178.89 | (left blank) |
| Rent | (left blank) | $2,500.00 |
| **Total** | $1,407.24 | $2,830.30 |

On November 26, 2012, the U.S. Trustee filed a motion to dismiss or convert the Debtors' case.[42]  Among the grounds for dismissal or conversion, the U.S. Trustee cited the "inability of the [U.S. Trustee] to reconcile information concerning the Debtors' assets and liabilities with those reported in their sporadically submitted monthly operating reports."[43]  The U.S. Trustee asserted that "despite repeated warnings and requests," the Debtors had failed to remain current on their monthly reporting requirements.[44]  The U.S. Trustee further noted that, "[i]t is unclear why ABC&D [Recycling] continues to render payments on behalf of the

---

[39] *Id.* at 22 and 37.

[40] *In re Hannon*, Case No. 12-13862-WCH, Docket No. 203 at ¶ 18.  While the record does not disclose the date the August MOR was filed, I note that it was signed by the Debtor on October 1, 2012—after the September 15, 2012 due date.  *See* Docket No. 22, Ex. 1 at 34.

[41] Docket No. 22, Ex. 5.

[42] *In re Hannon*, Case No. 12-13862-WCH, Docket No. 203.

[43] *Id.* at 1.

[44] *Id.* at ¶ 22.

Debtors," and that "to the extent that other entities or parties are paying any of the Debtors' anticipated monthly expenses listed on Schedule J ($13,180), it is unclear the source of such funds."[45]

The Debtors opposed the U.S. Trustee's motion to dismiss or convert, and I conducted a hearing on the matter on December 19, 2012.[46]  At the conclusion of the hearing, I directed the U.S. Trustee to appoint a Chapter 11 Trustee for the Debtors' case.[47]  On December 21, 2012, the U.S. Trustee appointed Joseph H. Baldiga as the Chapter 11 Trustee.[48]  The same day, the Chapter 11 Trustee filed an assented to motion to convert the case to one under Chapter 7, asserting that conversion was in the best interest of the estate and creditors.[49]  On January 2, 2013, I granted the motion to convert the Debtors' case.[50]

On February 6, 2013, ABCD Holdings removed the Debtor as an officer of director of ABC&D Recycling and appointed McLaughlin as president.[51]  On March 13, 2013, I approved a sale of the Debtor's interest in ABC&D Recycling and Ware Real Estate to ABCD Holdings, rendering ABCD Holdings the 100% owner of both companies.[52]

On July 12, 2013, ABCD Holdings, ABC&D Recycling, and Ware Real Estate collectively filed a three-count complaint against the Debtor.  Count I alleged that the Debtor

---

[45] *Id.* at ¶ 18.

[46] *In re Hannon*, Case No. 12-13862-WCH, Docket Nos. 223 and 240.

[47] *In re Hannon*, Case No. 12-13862-WCH, Docket No. 240.

[48] *In re Hannon*, Case No. 12-13862-WCH, Docket No. 243.

[49] *In re Hannon*, Case No. 12-13862-WCH, Docket No. 244.

[50] *In re Hannon*, Case No. 12-13862-WCH, Docket No. 253.

[51] Plaintiffs' Statement of Facts, Docket No. 23 at ¶ 3.

[52] *Id.* at ¶ 2.

should be denied a discharge under 11 U.S.C. § 727(a)(4) for making a false oath or account.

Count II alleged that the Plaintiffs' debt was excepted from discharge pursuant to § 523(a)(4) as

one resulting from fraud or defalcation in a fiduciary capacity, embezzlement, and/or larceny.

Count III alleged that the debt was excepted from discharge pursuant to § 523(a)(6) as one

resulting from wilful and malicious injury.

On November 21, 2013, the Plaintiffs filed the present Motion for Summary Judgment as

to Count I of the Complaint.  The Plaintiffs primarily alleged that the Debtor made false

statements on his MORs by severely understating the amount of payments made by ABC&D

Recycling and Ware Real Estate for the Debtor's benefit from May to September 2012.[53]  To

support their allegations, the Plaintiffs relied on an investigation of ABC&D Recycling and Ware

Real Estate's records conducted by the accounting firm of Verdolino and Lowey ("V&L") in the

fall of 2012.  V&L reviewed the companies' bank statements and accounting records and

identified over $200,000.00 in disbursements from company accounts by check or debit card

which appeared to have no business purpose, and which V&L concluded were payments for the

Debtor's personal benefit.[54]

As Exhibit 2 to the Motion for Summary Judgment, the Plaintiffs attached a spreadsheet

of the Debtor's "Receipts & Disbursements from ABC&D and Ware – May 2012 to September

2012."[55]  The spreadsheet contained the transactions which V&L's analysis identified as incurred

for the Debtor's personal benefit from May 2012 to September 2012—the time period for which

---

[53] The Plaintiffs also alleged that the Debtor omitted a number of assets from "Schedule B – Personal Property."
The Plaintiffs, however, did not address the issue in their statement of undisputed facts, nor did they renew the
argument in their later pleadings.  Due to these omissions, and because the facts concerning the MORs form a
sufficient basis for this decision, I will not address the argument further.

[54] Affidavit of Craig R. Jalbert, CIRA, Docket No. 25 at ¶¶ 17-18.

[55] Docket No. 22, Ex. 2.

the Debtor filed MORs.  The spreadsheet contained 315 transactions totaling $99,329.12.[56]  The transactions included $46,322.39 in payments from company accounts via debit card or check.[57]  These charges included: payments to the Debtor's landlord; numerous payments at restaurants, grocery stores, gas stations, and other retailers; utility payments at the Wells House and the Truro House; and payments for the treatment and burial of a pet.[58]  The remainder of the transactions consisted of $53,006.73 in cash withdrawals from company accounts which V&L identified as not having a business purpose.[59]  Thus, the Plaintiffs alleged that the Debtor made false statements on his MORs by severely understating his receipts and outside disbursements made on his behalf from May to September 2012.

The Debtor, acting *pro se*, filed an opposition to the Motion for Summary Judgment on January 16, 2014.[60]  The Debtor's opposition attacked various aspects of the V&L investigation, primarily focusing on the fact that V&L reviewed records beginning in July 2011—before the Debtor began submitting MORs—and the fact that V&L assumed that the Debtor was responsible for all the transactions at issue.  The Debtor did not dispute that the transactions had occurred, but asserted that many of them were not made by him or that they did not benefit him personally.[61]

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] Docket No. 33.

[61] I note that in his initial opposition, the Debtor asserted that he was not responsible for any transactions occurring in May 2012, as a third party was operating ABC&D Recycling at that time.  The Debtor did not renew this argument in his post-hearing pleadings, and has conceded that the company made substantial payments on his behalf in that month.

11

I conducted a hearing on the Motion for Summary Judgment on January 8, 2014.  At the hearing, the Debtor again began to attack the tactics used by the Plaintiffs.  The following exchange occurred:

> THE COURT: Are you denying that all of those expenses were taken out of ABCD [Recycling] for your personal use?
>
> MR. HANNON: I absolutely am, Your Honor. All of them.
>
> THE COURT: You can justify each of those expenses as having some business purpose?
>
> MR. HANNON: I would say 99.9 percent of them. Yes, Your Honor. [62]

At the conclusion of the hearing, I took the matter under advisement and directed the Debtor to "spell out in detail in a pleading exactly what your defenses are to all of their charges, which are significant charges . . . ."[63]

On March 28, 2014, the Debtor, now represented by counsel, filed the "Defendant's Brief in Support of Opposition to Plaintiff's Motion for Partial Summary Judgment."[64]  The brief was supported by an affidavit from the Debtor (the "Debtor's Affidavit"), in which the Debtor asserted that many of the payments and withdrawals had a business purpose.[65]  The Debtor also provided a version of the Plaintiffs' Exhibit 2, adding a column to the spreadsheet which contained the Debtor's explanation of each transaction (the "Debtor's Explanation").[66]  The

---

[62] Trans. Jan. 8, 2014 at 11:18-25.

[63] Trans. Jan. 8, 2014 at 12:3-5.

[64] Docket No. 48.

[65] *See* Docket No. 48, Ex. 1.

[66] *See* Docket No. 48, Ex. 3.

Debtor's Explanation divided the transactions into those which he "believes were incurred for his benefit" and those which he "believes was [sic] incurred for legitimate business purposes."[67]

Of the transactions at issue, the Debtor's Explanation identified $19,323.22 as personal, $77,155.91 as having a business purpose, and $2,849.99 as having both a personal and business purpose.  The transactions the Debtor conceded were personal included: eleven cash withdrawals totaling $4,037.00, which the Debtor labeled as "Stipend[s] to Joint Debtor;" two paychecks from ABC&D Recycling to the Debtor totaling $2,455.25; two rent payments to the Debtor's landlord totaling $7,500.00; and three payments totaling $1,500.00 to a boat storage facility in Shapleigh, Maine.  The remaining $3,830.97 of conceded personal expenses consisted mainly of company debit card purchases at various retailers for groceries, clothing, and entertainment.  The Debtor asserted that his daughters had made $716.12 of the purchases for music and video games, as he had given them access to the ABC&D Recycling debit card.[68]  The Debtor further stated that he "believes" the stipends to the Joint Debtor and his paychecks were reported on the MORs.[69]

Nevertheless, in the Debtor's Affidavit, he asserted that most of the transactions had a business purpose.  The Debtor stated that the vast majority of the cash withdrawals were used to buy scrap metal from the public for cash.[70]   The Debtor's Explanation labeled a total of $43,652.50 in cash withdrawals as "Scrap."  The Debtor also stated that another employee of ABC&D Recycling, Kevin Litchfield, had a company debit card, and thus not all of the

---

[67] *Id.* at 1.

[68] *Id.*; Debtor's Affidavit, Docket No. 48, Ex. 1 at ¶ 12.

[69] Debtor's Explanation, Docket No. 48, Ex. 3 at 1.

[70] Debtor's Affidavit, Docket No. 48, Ex. 1 at ¶¶ 9-10.

13

withdrawals were incurred by the Debtor.[71]  The Debtor's Explanation labeled cash withdrawals

and gas station payments totaling $1,918.08 as "Not incurred by Debtor."

Next, the Debtor claimed that he would hire day laborers from the local prison to work at

ABC&D Recycling, and incurred expenses to transport and feed them.[72]    The Debtor's

Explanation labeled payments to grocery stores totaling $1,172.75 as "ABC&D Grocery" and

payments to transportation services totaling $2,915.00 as "Labor Transport."

The Debtor explained that he incurred other expenses while traveling throughout

Massachusetts to service existing business and obtain new business for ABC&D Recycling.[73]

The Debtor's Explanation labeled payments to restaurants totaling $1,689.60 as a "Business

Meal" or "Travel Expense."  The Debtor labeled payments to gas stations totaling $3,427.24 as

"Gas- Co. Car."

The Debtor further stated that it was his practice to invite potential clients to his vacation

homes in Truro and Wells to build new business, and thus many of the expenses related to the

houses were business expenses.[74]  He explained that he would allow the clients to charge meals

at restaurants close to the homes to an ABC&D Recycling account.[75]   The Debtor's Explanation

labeled payments totaling $3,205.09 as relating to the "client guest house."  These included

charges for utilities and landscaping, charges at hardware and liquor stores, and payments to

nearby restaurants.  The Debtor also labeled $2,849.99 in utility payments for the Truro House

---

[71] *Id.* at ¶¶ 10-11.

[72] *Id.* at ¶ 13.

[73] *Id.* at ¶ 17.

[74] *Id.* at ¶¶ 15-16.

[75] *Id.* at ¶ 16.

and the Wells House as having both a "personal and business" purpose, ostensibly due to clients' use of the houses.

Finally, the Debtor's Explanation identified other categories of business expenses which the Debtor did not address in his affidavit. Payments to Nstar totaling $1,572.78 were labeled "Company Utility" or "ABC&D Utility." Payments totaling $5,743.42 for the treatment and burial of a dog were labeled "on behalf of employee." Payments totaling $4,127.28 were labeled "Unknown," but which the Debtor nonetheless asserted he believed had a business purpose. The remaining $7,732.17 identified as business expenses consisted primarily of payments to retailers for business supplies.

Notably, the Debtor's Explanation identified three payments as business expenses which he previously listed as "estate disbursements" made "on behalf of Debtors" on the Addendum to his May MOR.[76] A payment to Dish Network of $97.84 and a payment to NSTAR Electric of $355.76, which the Debtor identified as "on behalf of Debtors" on the Addendum were labeled "Client guest house" and "Company utility" on the Debtor's Explanation.[77] A payment to Hannaford of $178.89 also listed "on behalf of Debtors" on the Addendum was labeled "ABC&D Grocery."[78]

The Plaintiffs filed a "Reply Brief in Support of Summary Judgment" on April 11, 2014.

---

[76] Docket No. 22, Ex. 5; Debtor's Explanation, Docket No. 48, Ex. 3 at 1, 2.

[77] *Compare* Docket No. 22, Ex. 5 *with* Debtor's Explanation, Docket No. 48, Ex. 3 at 1, 2.

[78] *Compare* Docket No. 22, Ex. 5 *with* Debtor's Explanation, Docket No. 48, Ex. 3 at 1.

## IV. <u>POSITIONS OF THE PARTIES</u>

A. <u>The Plaintiffs</u>

The Plaintiffs argue that the Debtor's identification of numerous expenses as "incurred for his benefit" is a sufficient basis for granting summary judgment. The Plaintiffs assert that the Court ought to treat the Debtor's Explanation as a binding admission that the expenses were personal and ought to have been reported on his MORs. The Plaintiffs point out that the Debtor's Explanation identifies over $12,000.00 in personal expenses that were not reported on the MORs. The Plaintiffs emphasize that at hearing the Debtor stated that "99.9%" of the transactions at issue were business related, but has since conceded that a substantial number were personal.

Further, the Plaintiffs dispute that the Debtor's stipends to the Joint Debtor were reported on the MORs. While the Debtor's Explanation states that he "believes" the stipends were reported, the Plaintiffs point out that the May and June MORs each reported "0" in receipts. As to the July and August MORs, the Plaintiffs assert that none of the deposits into the Debtors' DIP accounts during those months correspond to the withdrawals made for the Joint Debtor. Accordingly, the Plaintiffs argue that it is undisputed that the Debtor failed to report over $4,000.00 in stipends to the Joint Debtor, in addition to over $12,000.00 which the Debtor concedes was not reported.

The Plaintiffs also contend that the Court should give no weight to the statements in the Debtor's Affidavit and Explanation that contradict his prior sworn testimony. The Plaintiffs argue that the Debtor's claim that he incurred over $2,000.00 in "client guest house" expenses conflicts with his testimony at the 341 Meeting that the Truro House and the Wells House were rarely used, and only by him and his family. Similarly, the Plaintiffs point out that the Debtor

16

identified over $3,000.00 in expenses for a "company car," whereas he testified at the 341 Meeting that his companies owned only the car used by the Joint Debtor. The Plaintiffs also point out that the Debtor's Explanation listed three expenses totaling over $1,000.00 as having a business purpose, even though the Addendum to his May MOR identified the expenses as personal. Given the Debtor's unexplained changes to his testimony, the Plaintiffs assert that the Debtor has not raised a genuine dispute that all of these expenses were personal.

Moreover, the Plaintiffs assert that the Debtor's Explanation is deficient with regard to two other categories of expenses. First, the Plaintiffs argue that the Debtor's identification of over $5,000.00 in expenses to treat and bury a dog as "on behalf of employee" is a thinly veiled reference to his fiancée, Sofia Gagua, who was at one time on the payroll for ABC&D Recycling.[79] In any event, the Plaintiffs contend that such expenses are not properly considered a business expense, even if made on an employee's behalf. Second, the Plaintiffs point out that the Debtor labeled over $4,000 in expenses as "Unknown" and allege the Debtor did so to avoid identifying the expenses as personal, as the transactions are mainly grocery and retail store payments which would be difficult to justify as business expenses.

In sum, the Plaintiffs assert that the Debtor's admissions concerning personal expenses and his failure to raise a genuine issue of fact as to certain other transactions provides a sufficient basis for summary judgment, despite the Debtor's sworn statements that the majority of the transactions were business expenses. Moreover, the Plaintiffs contend that the magnitude of the Debtor's omissions from his MORs demonstrates, at a minimum, a reckless indifference to the truth. The Plaintiffs argue that the Debtor cannot now assert that he was unaware of his duty to report the personal expenses on his MORs, as he made a partial disclosure of the outside

---

[79] The Debtor and the Joint Debtor are separated; the Debtor and Gagua live together.

disbursements on the May and June reports.  The Plaintiffs assert that the Debtor could have conducted his personal financial affairs through his DIP account, but instead to used his company debit cards and accounts to mislead the U.S. Trustee and his creditors as to the state of his finances.  Finally, the Plaintiffs contend that the omissions were material to the Debtor's bankruptcy case, as the Debtor's personal spending depleted the assets of his companies while the Debtor's case remained in Chapter 11.

B. The Debtor

The Debtor first argues that there is a genuine issue of material fact as to which transactions he was required to report on his MORs.  The Debtor contends that he is unable to verify the nature of all of the transactions at issue because McLaughlin is in possession of ABC&D Recycling and Ware Real Estate's records, having first taken them in July 2012 and having subsequently become the owner of both companies.  Furthermore, the Debtor asserts that he was only required to report his income on the MORs.  The Debtor submitted an affidavit from Jeffrey M. Dennis, a certified public accountant, which states that personal expenses paid by an S corporation on behalf of its owner do not necessarily constitute personal income to the owner. Thus, the Debtor argues that until the amount of income he earned from ABC&D Recycling and Ware Real Estate has been established, the Plaintiffs cannot show that his MORs were inaccurate.

Next, the Debtor contends that there is a genuine issue of material fact as to whether he was aware of the inaccuracies, if any, on his MORs.  The Debtor argues that the Plaintiffs have failed to show that he had actual knowledge of all of the personal charges, such as those which his daughters made to ABC&D Recycling's debit card.  The Debtor asserts that he relied on his former counsel to prepare the MORs from the DIP account bank statements, the same procedure

18

he followed as a debtor-in-possession in a prior Chapter 11 case. The Debtor claims that he had a good faith belief that the reports were accurately prepared, and that the U.S. Trustee never objected to the procedure he used to prepare the MORs. Moreover, the Debtor asserts that he lacked the financial training and knowledge to accurately complete the reports. He again relies on Dennis's affidavit, which states that a layperson without financial training in the cash versus accrual methods of accounting and the tax structure of S corporations would not be able to accurately complete the MORs. The Debtor argues that his inability to comply with generally accepted accounting principles is not evidence of fraudulent intent.

Finally, the Debtor argues that transactions at issue were not material to his bankruptcy case. He points out that the majority of the transactions the Plaintiffs allege were personal did have a business purpose. The Debtor contends that, in light of the significant claims and assets in the case, the personal expenses which he concedes were omitted from his MORs were relatively small and immaterial. The Debtor also asserts that diversion of funds from ABC&D Recycling and Ware Real Estate was material only to the Plaintiffs' claim, and thus the proper remedy lay under 11 U.S.C. § 523 to except the claim from discharge, not to deny his discharge entirely under 11 U.S.C. § 727(a)(4)(A).

## V. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[80]  A dispute is genuine if the evidence is such that a reasonable

---

[80] Fed. R. Civ. P. 56(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

jury could resolve the issue in favor of the nonmoving party.[81]   A fact is material if it has the potential to determine the outcome of the suit under the governing law.[82]   The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[83]

The moving party bears the initial burden of demonstrating that the record, including the discovery materials on file and any affidavits, shows that there is no genuine issue as to any material fact.[84]   After such a showing, the burden shifts to the nonmoving party to "go beyond the pleadings" and produce evidence of "specific facts showing that there is a genuine issue for trial."[85]   "'[C]onclusory allegations, improbable inferences, and unsupported speculation,' are insufficient to establish a genuine issue of fact."[86]   Moreover, the nonmoving party may not manufacture a disputed issue of material fact by contradicting his own prior sworn testimony.[87] "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."[88]

---

[81]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[82]   *Id.*

[83]   *Id.* at 247-248.

[84]   *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[85]   *Celotex Corp. v. Catrett*, 477 U.S. at 324 (internal quotations omitted).

[86]   *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

[87]   *Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (B.A.P. 1st Cir. 2000).

[88]   *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

B. False Oath or Account

Pursuant to 11 U.S.C. § 727(a)(4)(A), "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[89]   The party objecting to the discharge must show that the debtor: (1) "made a false oath in or in connection with the case;" (2) "knowingly and fraudulently;" and (3) "relating to a material fact."[90]

1. False Oath

As to the first element, the Plaintiffs must show that the Debtor made a statement under oath and that the statement was false.  By federal statute, an unsworn declaration made under penalty of perjury is the equivalent of a verification under oath.[91]   The Debtor signed the MORs under penalty of perjury, rendering his statements therein a statement under oath.  Thus, the remaining question is whether his statements on the MORs were false.

Each MOR required the Debtor to report "receipts" and "estate disbursements made by outside sources."[92]   From the outset, I note that the MORs required the Debtor to report all receipts, regardless of whether they constituted income to him for tax purposes.  The MOR form asks for receipts from "cash sales," "accounts receivable," "loans and advances," "sale of assets," "transfers (from DIP accts)," and all "other" receipts.[93]   As other courts have explained, a Chapter 11 debtor must report money received from third parties to pay its expenses, even if

---

[89] 11 U.S.C. § 727(a)(4)(A).

[90] *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 271 (Bankr. D. Mass. 2012).

[91] 28 U.S.C. § 1746; *see also Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 276 (B.A.P. 1st Cir. 1999).

[92] *See, e.g.*, Docket No. 22, Ex. 1 at 4.

[93] *Id.*

the payments are ultimately determined not to be income to the debtor.[94]   For example, in *In re Sieber*, a debtor failed to disclose substantial payments he received from a company in which he had an interest on his MORs.[95]   The debtor asserted that he did not report the payments because they were made in order for him to pay the company's business expenses.[96]   In finding the omission constituted a false oath under 11 U.S.C. § 727(a)(4)(A), the court explained:

> It was not for the Debtor to pick and choose which sources of funds he considered income and disclosed in his reports . . . . Creditors and parties in interest are entitled to a complete financial picture of the Debtor's activities and the omissions from the Debtor's Monthly Operating Reports prevented any party from fully understanding the Debtor's activities.[97]

Contrary to the Debtor's assertions, he was required to report all payments ABC&D Recycling and Ware Real Estate made directly to the Debtors or on the Debtors' behalf, regardless of whether the payments were income.

The undisputed facts show that the Debtor made false statements on his MORs by failing to report substantial payments that ABC&D Recycling and Ware Real Estate made for his personal benefit.   From May to September 2012, the Debtor reported $4,237.54 in "estate disbursements made by outside sources" on his MORs.   The Debtor has now conceded that ABC&D Recycling and Ware Real Estate directly paid $12,830.97 of his personal expenses during that time.   Accordingly, by his own admission, his statement that ABC&D Recycling made only $4,237.54 in disbursements on his behalf was false.

---

[94] *In re Tucker*, 411 B.R. 530, 533 n.6 (Bankr. S.D. Ga. 2009) (finding the debtor was required to report money advanced by third parties to pay his expenses on his monthly operating reports, regardless of whether the funds were income, gifts, capital contributions, or loans.); *see also In re 210 W. Liberty Holdings, LLC*, 08-677, 2009 WL 1522047 at *6 (Bankr. N.D.W. Va. May 29, 2009) (same).

[95] *United States Trustee v. Sieber (In re Sieber)*, 489 B.R. 531, 556-57 (Bankr. D. Md. 2013).

[96] *Id.*

[97] *Id.* at 557.

In addition, ABC&D Recycling paid the Joint Debtor $4,037.00 in cash "stipends" between May 2012 and August 2012.  The Debtor stated that he believed these stipends were reported on the MORs.  To the contrary, the May and June MORs each reported "0" in receipts, despite the Joint Debtor receiving $809.00 in May and $304.00 in June as stipends.  As to July and August, the Debtor reported revenues in those months which matched the amounts deposited into his own DIP account.  None of the deposits into either the Debtor's or the Joint Debtor's DIP account in July and August 2012 match the amounts of the stipends from ABC&D Recycling.  Thus, the record shows that the Debtor failed to report $4,037.00 in receipts from ABC&D Recycling on his MORs.

Moreover, the Debtor's explanations for various charges contradict prior statements he made under oath.  To the extent the Debtor's Affidavit and Explanation contradict his prior sworn statements without a compelling explanation, I will consider the Plaintiffs' assertions concerning those facts undisputed.[98]  Most prominently, the Debtor testified at the 341 Meeting that the Wells House was used only "occasionally during the day," that it required repair work before it would be rentable, and that he had stayed there only about ten times since 1997. Similarly, the Debtor testified that the Truro House was "unoccupied" and "empty," except that he personally used it "once in a while."  In the Debtor's Affidavit, he now states that he would allow ABC&D Recycling's clients to use the Wells House and the Truro House in order to build business.  The Debtor has provided no explanation for his change in testimony.  As such, the Debtor has not raised a genuine dispute that the $3,205.09 in "client guest house" expenses and the $2,849.99 in utility payments labeled as both "personal & business" were in fact incurred solely for his personal benefit.  In addition, the Debtor's Explanation identified three payments

---

[98] *See In re Pilavis*, 244 B.R. at 176.

as business expenses which he had previously listed as "estate disbursements" made "on behalf of Debtors" on the Addendum to his May MOR.  These payments—two utility payments and a grocery bill—totaled $632.49.  The Debtor has also failed to raise a genuine dispute that these expenses were personal.

In sum, there is no dispute that ABC&D Recycling and Ware Real Estate made payments on behalf the Debtors totaling $19,518.54 between May and September 2012.  The Debtor reported only $4,237.54 of these outside disbursements on his MORs.  There is also no dispute that ABC&D Recycling paid the Joint Debtor $4,037.00 in cash stipends, which the Debtor failed to report as receipts on his MORs.  The Debtor omitted transactions that he was required to report from each of the May, June, July, August, and September MORs.  Thus, the Debtor made a false oath on each MOR he submitted to the U.S. Trustee.

Notwithstanding the Debtor's contention that he could not fully respond to the Plaintiffs' allegations without access to ABC&D Recycling's business records, the Debtor has failed to explain how the records would show that these transactions were business expenses.  The Debtor does not assert that the missing records will demonstrate that ABC&D Recycling's payment of expenses such as his rent, utilities, clothing, and entertainment had a business purpose.  Even assuming that the records would bear out the Debtor's assertion that the transactions labeled "unknown" were business related, the Debtor's own admissions and the record show that he omitted over $19,000.00 in payments from his MORs.  As the undisputed facts establish that the Debtor made a false oath on each MOR, it is unnecessary to resolve the factual disputes regarding the over $70,000.00 in payments that the Plaintiffs allege also ought to have been reported.

2. Fraudulent Intent

"The requirement that the false oath be 'knowingly and fraudulently' made is met 'if the debtor knows the truth and nonetheless willfully and intentionally swears to what is false.'"[99] "[R]eckless indifference to the truth . . . has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)."[100] "Even though courts will not construe an ignorant or inadvertent omission as evidence of fraudulent intent, reckless disregard may nonetheless be found based on the 'cumulative effect of a series of innocent mistakes.'"[101]

A court must exercise caution in deciding issues of intent at the summary judgment stage, especially when the moving party bears the burden of proof as to the nonmoving party's state of mind.[102]   Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."[103]   "Because a debtor rarely gives direct evidence of fraudulent intent . . . even on summary judgment, intent to defraud a creditor can be proved by circumstantial evidence."[104]   "Evidence of fraud is conclusive enough to support summary judgment . . . when it yields no plausible conclusion but that the debtor's intent was fraudulent."[105]

---

[99] *In re Fontaine*, 467 B.R. at 272 *(quoting Lussier v. Sullivan (In re Sullivan)*, 444 B.R. 1, 8 (Bankr. D. Mass. 2011)).

[100] *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987).

[101] *J.P. Morgan Chase Bank v. Koss (In re Koss)*, 403 B.R. 191, 213 (Bankr. D. Mass. 2009) *(quoting Discenza v. MacDonald (In re MacDonald)*, 50 B.R. 255, 259 (Bankr.D.Mass.1985)).

[102] *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir. 1994).

[103] *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

[104] *Marrama v. Citizens Bank of Mass. (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006) *(citing In re Varrasso,* 37 F.3d at 764).

[105] *Id.*

Here, given the volume and repeated nature of the Debtor's omissions, the only plausible conclusion is that the Debtor acted with reckless indifference to the truth when filing his MORs.[106]   This case is similar to *In re Donahue*, in which the debtors admitted that their bankruptcy filings contained at least five separate omissions or misstatements concerning a piece of property they had sold pre-petition.[107]   In that case, the United States Bankruptcy Appellate Panel for the First Circuit found that the "numerous, accumulated false statements" on the Debtors' schedules could not be attributed to mere inadvertence and upheld the bankruptcy court's grant of summary judgment under 11 U.S.C. § 727(a)(4)(A).[108]   Similarly, in the case at hand, the Debtor made repeated false statements, failing to report substantial payments from his companies on each of the five MORs he filed.

In addition, the magnitude of the omissions belies the Debtor's assertion that he merely overlooked small personal transactions that were dwarfed by ABC&D Recycling's large cash flow.   For example, the Debtor failed to report a payment of $5,000.00 for his personal rent on the May MOR.   Such a payment is hardly one that is "relatively small and immaterial" and would escape the notice of the Debtor.[109]   The Debtor then repeated the omission on the Addendum to the May and June MORs, indicating that ABC&D Recycling paid $2,500.00 for his rent in June, and leaving the "Rent" line blank for the month of May.   On the July, August, and September MORs, the Debtor went so far as to report "0" in outside disbursements, despite ABC&D Recycling paying thousands of dollars for his expenses in those months.   Both the

---

[106] *See Harrington v. Donahue (In re Donahue)*, BAP No. NH 11-026, 2011 WL 6737074 at *13-14 (B.A.P. 1st Cir. Dec. 20, 2011).

[107] *Id.* at *13.

[108] *Id.*

[109] *See* Docket No. 50 at 5.

repeated nature and the magnitude of the Debtor's omissions from his MORs compel the conclusion that the Debtor acted with reckless indifference to the truth.

Moreover, the Debtor's partial disclosure of payments ABC&D Recycling made on his behalf in May and June 2012 demonstrates that he understood his duty to report such transactions and was able to obtain the necessary information to do so.  As discussed above, the Debtor did not have to determine his income or understand the tax structure of his companies to accurately complete the MORs.  He was simply required to report the companies' payments made to him and on his behalf.  There is no dispute that the Debtor personally used ABC&D Recycling's debit card to pay his expenses and gave his daughters access to the same to pay for clothing, school supplies, and entertainment.  Thus, the Debtor knew the company was making disbursements on his behalf.  Nevertheless, the Debtor selectively reported only a few of these transactions on his May and June MORs and failed to include any of them on the July, August, and September MORs.

Finally, the Debtor may not use his reliance on counsel to complete the MORs to rebut the evidence of fraudulent intent.  In *In re Tully*, the United States Court of Appeals for the First Circuit addressed the debtor's argument that his omission of assets from his bankruptcy petition was not knowing and fraudulent under 11 U.S.C. § 727(a)(4)(A), as he relied on counsel to accurately complete his bankruptcy schedules.  In affirming the bankruptcy court's finding of fraudulent intent, the First Circuit explained:

> [I]t is well settled that reliance upon advice of counsel is . . . no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules. A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.[110]

---

[110] *In re Tully*, 818 F.2d at 111 (internal citations omitted).

Similarly, in this case, it ought to have been evident to the Debtor that he should report all receipts and disbursements from his companies on his MORs.  In fact, the Debtor's partial disclosure of such transactions demonstrates that he did know of his duty to report them.

In any event, the Debtor failed to establish that he provided his counsel with full access to his financial information, such that his alleged reliance on counsel to accurately complete the MORs would be appropriate.  The Debtor's Affidavit states that he "followed the [] procedure of providing [his] counsel with statements from [his] debtor-in-possession accounts, and then reviewing the report prepared by counsel."[111]  The crux of the Plaintiffs' allegations, however, is that the Debtor chose to conduct his personal finances through ABC&D Recycling and Ware Real Estate's accounts, rather than his DIP Account.  The Debtor's own statement indicates that he may not have not provided his counsel with the information concerning the payments his companies made on his behalf.  In sum, "the record is devoid of any circumstances which would mitigate against the [debtor's] cumulative falsehoods and demonstrate that there is a genuine issue of material fact as to [his] intent."[112]

### 3. Materiality

As to the final element, "[a] material fact under [11 U.S.C.] § 727(a)(4) is one that has a non-trivial effect upon the estate and creditors."[113]  A statement is generally material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of

---

[111] Debtor's Affidavit at ¶ 7.

[112] *In re Donahue*, 2011 WL 6737074 at *14.

[113] *In re Fontaine*, 467 B.R. at 272.

assets, business dealings, or the existence and disposition of property."[114] "Courts have acknowledged that 'the threshold to materiality is fairly low.'"[115]

The false statements on the Debtor's MORs were clearly material to his bankruptcy case. "Monthly operating reports provide necessary information to the Court, creditors, and other parties in interest about the progress and prospects of a debtor's reorganization efforts."[116] Failure to timely comply with the reporting requirements is cause for dismissal or conversion of a Chapter 11 case.[117]   Here, the Debtor's omission of over $19,000.00 in receipts and disbursements from ABC&D Recycling and Ware Real Estate prevented parties in interest from accurately assessing the viability of a reorganization or understanding the Debtor's true financial condition.   In fact, the U.S. Trustee based its motion to convert or dismiss the Debtor's case in part on his failure to timely and accurately complete the MORs.   As the Plaintiffs point out, the Debtor remained in Chapter 11 for almost eight months before his case was converted and the liquidation of his assets, including his ownership interest in ABC&D Recycling and Ware Real Estate, commenced.   During that time, the Debtor used the companies to fund his personal expenses while falsely claiming that they made few or no disbursements on his behalf.   His false statements not only hid the state of the Debtor's finances from parties in interest, but also had the potential to affect the value of estate property.   Thus, the Debtor's contention that the transactions were immaterial, or relevant only to the Plaintiffs' claim, is without merit.

---

[114] *Id.* (*quoting In re Tully*, 818 F.2d at 111).

[115] *In re Sullivan*, 455 B.R. at 839 (*quoting Cepelak v. Sears (In re Sears),* 246 B.R. 341, 347 (8th Cir. BAP 2000)).

[116] *In re Babayoff*, 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011).

[117] *See* 11 U.S.C. § 1112(b)(4)(F).

## VI. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order granting the Motion for Summary

Judgment.

_____

William C. Hillman
United States Bankruptcy Judge

Dated: June 10, 2014


Counsel Appearing:

     Joel Faller, The McLaughlin Brothers, P.C., Boston, MA
     James M. Liston, Sarah A. Smegal, Bartlett Hackett Feinberg, P.C., Boston, MA
          for the Plaintiffs
     Herbert Weinberg, Patrick Martin, Rosenberg & Weinberg, North Andover, MA
          for the Debtor